**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-CR-74 (CJN)** |
| | : | |
| **DEREK ANDREW NELSON,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DEREK JACCOB DODDER,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Derek Nelson on his conviction of 18 U.S.C. § 1752(a)(1) to 6 months' incarceration (a sentence at the top of the Guidelines Range), 1 year of supervised release, 60 hours of community service, and, consistent with his plea agreement, $500 in restitution. The government requests that this Court sentence Defendant Derek Dodder to 60 days on his conviction of 40 U.S.C. § 5104(e)(2)(D) and 36 months' probation on his conviction of 40 U.S.C. § 5104(e)(2)(G), 60 hours of community service, and, consistent with his plea agreement, $500 in restitution.

### I. Introduction

Defendants Derek Andrew Nelson and Derek Jaccob Dodder, both 31-year-old former Marines and friends, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College

vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Nelson pleaded guilty to violating 18 U.S.C. § 1752(a)(1), and Dodder pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 5104(e)(2)(G).  The government's recommendation for a sentence of incarceration as to both defendants is supported by: (1) Nelson's and Dodder's preparation for violence by bringing respirators and goggles to the Capitol; (2) their surging forwards as part of the vanguard of the mob overrunning the police line at the Northwest scaffolding, a crucial breach point on January 6; (3) the pair's knowledge when they entered the Capitol building that Congress should have been certifying the Electoral College votes; (4) their entry into the building through the Senate Wing Door minutes after it had been breached; (5) Nelson and Dodder joining the mob outside the House Main Door as the mob sought to break it down, and then donning respirators to avoid the effects of tear gas used by police to clear the area; (6) the overall length of time (48 minutes) Dodder and Nelson spent inside the Building across multiple areas (the Crypt, Senate Wing Door, Rotunda, House Main Door); and (7) both Dodder's and Nelson's post-plea statements reflecting varying degrees of minimization for their conduct and a lack of true remorse.

As to Nelson specifically, the government's recommendation is further supported by Nelson's grabbing of a shield from a retreating U.S. Capitol police officer and his attempt to body-

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

check that officer.  It is also supported by Nelson's calls for "revolution" before breaching the Capitol building, including his Revolutionary War outfit that he wore that day and calling members of Congress "enemies."

As to Dodder, the government's recommendation is further supported by Dodder's destruction of valuable evidence, *i.e.* his GoPro footage from January 6, 2021.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.  But for their actions alongside so many others, the riot likely would have failed.  Here, the facts and circumstances of Nelson's and Dodder's crimes support a sentence of 6 months and 60 days incarceration, respectively.

## II.  Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 34 (Nelson Statement of Offense or "Nelson SOO") at ¶¶ 1–7; ECF No. 39 (Dodder Statement of Offense or "Dodder SOO") at ¶¶ 1–7.

### Nelson's and Dodder's Role in the January 6, 2021 Attack on the Capitol

Co-defendants Derek Nelson and Derek Dodder, friends from their military service in the U.S. Marines, planned to travel to Washington, DC to attend former President Trump's January 6, 2021 "Stop the Steal" rally at the Ellipse.  Based on their post-plea interviews, Nelson first contacted Dodder about the rally.[2]  On January 4, Dodder flew from Nevada to Illinois, where

---

[2] The Government has not independently corroborated the facts in this and the following paragraph.

Nelson lived, at Nelson's expense.  The same day, Nelson made a post to Instagram of their dinner with the hashtag, "#revolutiondinner."

On January 5, 2021, Nelson and Dodder drove down from Illinois to Washington, D.C. Anticipating violence and tear gas in Washington, they each purchased respirators from a local hardware store.  They arrived early in the morning of January 6.

On January 6, 2021, Nelson's outfit of choice included a colonial blue peacoat, a tricorn hat, and white scarf.  Nelson SOO ¶ 8; *see* Image 1 below.  Nelson also carried an American flag on a flagpole and wore gloves and a black backpack.  Dodder wore a black baseball hat, a green camouflage jacket, black-and-red gloves, khaki camouflage-style pants, and at times, carried an American flag around his neck.  *See* Dodder SOO ¶ 9; Image 1 below.  As Dodder later explained during his post-plea interview, the camouflage was intended to be theatrical, but Dodder thought it would also cover his body better if he fell or got into a confrontation.  Dodder also had a handheld GoPro device.  Both Nelson and Dodder brought with them the respirators they had purchased, as well as protective goggles.

Nelson and Dodder attended the rally on the National Mall.  Near the Washington Monument, an individual asked Nelson and two other individuals in colonial attire why they were there.  Nelson responded, "To start a revolution. Why are you here?"  Nelson SOO ¶ 9.  Towards the end of former President Trump's speech, Nelson and Dodder followed the crowd west towards the Capitol.  *Id.*; Dodder SOO ¶ 9; *see* Image 1 below.



*Image 1: Dodder (circled orange) and Nelson (circled yellow) walk with the crowd towards the Capitol*

Nelson and Dodder joined the large, belligerent crowd outside the northwest scaffolding. The pair joined the mob's chants against a line of officers, standing feet away from them, who were defending the entry to the scaffolding.  Dodder joined the chants of "USA!," and Nelson pointed and shouted, "To protect the constitution of the United States against enemies, foreign and domestic." *See* Nelson SOO ¶ 10; Dodder SOO ¶ 10; Image 2.  As the mob's anger swelled, both Nelson and Dodder donned their goggles, and Nelson put on his respirator mask.  *See* Images 2, 3.



*Image 2: Nelson (circled yellow) and Dodder (circled orange) wore their goggles and yelled as officers feet away defended the scaffolding*



*Image 3: Nelson (circled yellow) donned his pink respirator shortly before rioters overran officers*

The mob—using their fists, bodies, and sprays—overran the line of officers defending the scaffolding.  Nelson and Dodder surged forward with the mob, into the breach and up the scaffolding.  *See* Images 4, 5 (Sentencing Exhibit 1 at approx. 0:28, 0:35).



*Images 4 and 5: Dodder (left, orange circle) and Nelson (right, yellow circle) joined the surge of rioters overrunning the U.S. Capitol Police officers at the Northwest Scaffolding (Sentencing Exhibit 1)*

Like something out of a medieval siege, the mob charged up the scaffolding, with rioters engaging in hand-to-hand combat with outnumbered police. The angry mob repeatedly assaulted, overwhelmed, and overran officers, pushing them further up the scaffolding—first to a chokepoint about halfway up, then to a barricade at the top of the scaffolding, and finally to the landing of the stairs leading to the Upper West Terrace. Each time, Nelson stood near the front of the rioters. *See* Images 6 through 8; *see* Nelson SOO ¶¶ 12-14.





*Image 6 through 8: Nelson (circled) watched the front line of the mob overwhelm multiple police lines*

At 2:09 p.m., the mob routed the defensive line of officers on the landing of the stairs depicted in Image 8 above. As officers began retreating, Nelson again surged forward with the mob. As he charged towards the stairs, Nelson encountered a lone Capitol Police officer defending himself with a riot shield. *See* Nelson SOO ¶ 15. Nelson grabbed the shield with one hand. *See* Image 9 (Sentencing Exhibit 2). After lowering his shoulder, Nelson attempted to body-check the officer's shield, and the officer dropped it. *See* Image 10 (Sentencing Exhibit 2). Nelson helped another rioter pick up the shield. The other rioter, holding the stolen shield, charged forward. *See* Image 11 (Sentencing Exhibit 3).



*Image 9: Nelson's hand (yellow circle) holding a USCP officer's riot shield (zoomed image from Sentencing Exhibit 2 at 0:10)*



*Image 10: Nelson (circled yellow) lowered his body and attempted to body-check the shield (red) held by the officer (green) (zoomed image from Sentencing Exhibit 2 at approx. 0:10)*



*Image 11: Moments after Nelson (circled yellow) assisted another rioter in obtaining a police shield, the other rioter charged up the stairs holding the shield (circled red) (Sentencing Exhibit 3 at 0:08)*

At the top of the stairs, Nelson joined the mob facing off against the final defensive line of U.S. Capitol Police officers, behind a bike rack barricade at the entrance to the Upper West Terrace.  *See* Image 12.  When rioters also overcame that line, the path to the Capitol building was clear.



*Image 12: Nelson (circled yellow) near the front of the mob before it overran the final line of officers defending the entrance to the Upper West Terrace*

Nelson and Dodder regrouped on the Upper West Terrace and approached the Senate Wing Door. After hearing other rioters exclaim "gun" and "rubber bullets," they retreated momentarily, before once again turning around and heading towards the building. Nelson SOO ¶¶ 17–18; Dodder SOO ¶¶ 13–14. At 2:16 p.m., less than three minutes after the initial breach of that door, Dodder entered the Capitol building by climbing through a broken-out window to one side of the Senate Wing Door, and Nelson followed through the Senate Wing Door. *See* Images 13, 14. A continuous alarm was audible at that time.



*Image 13 and 14: Dodder (circled orange) entered the U.S. Capitol Building through a broken window to one side of the Senate Wing Door, and Nelson (circled yellow) followed through the door*

Nelson and Dodder headed down the hall to the Crypt. There, Dodder joined the mob's chants of "Our House" and filmed with his GoPro. Dodder SOO ¶ 15. At approximately 2:25 p.m., the mob pushed through yet another line of police attempting to hold rioters back in the

Crypt.  *Id;* Nelson SOO ¶ 19. As Nelson followed the triumphant mob up a staircase to the second floor, another rioter called out to him and other rioters, "Who do they work for?" Nelson pumped his fist in the air and yelled, "Us."  Nelson SOO ¶ 20.  Nelson knew this referred to members of Congress then present in the Capitol Building.  *Id.*

At 2:33 p.m., Nelson and Dodder arrived in the Rotunda.  Nelson SOO ¶ 21, Dodder SOO ¶ 16.  They laughed and celebrated.  As Nelson would later explain in his second interview, they were elated by their achievement—they had successfully stormed the Capitol.  *See* Image 15.



*Image 15: Dodder (orange square) and Nelson (yellow square) celebrated in the Rotunda*

Two minutes later, the pair walked to Statuary Hall to join the growing crowd near the House Chamber.  Pausing next to a window on one side of the hall, they saw officers on the grounds below.  Nelson commented to Dodder, "Hurt 'em. We hurt 'em boys."  Nelson SOO ¶ 22; Dodder SOO ¶ 17.  Dodder replied, "We stick with our guys we're good."  *Id.*  Meanwhile, the mob in Statuary Hall chanted loudly, "Stop the Steal."  *Id.*

At around 2:36 p.m., rioters overran the officers defending Statuary Hall—the final line of defense standing between the mob and the House Chamber, where members were sheltering inside. Nelson joined the mob's chants of "Stop the Steal" and made his way to the front of the mob, within feet of the House Door.  *See* Nelson SOO ¶ 23; Image 16.



*Image 16: Nelson (circled yellow), was feet away from the mob trying to breach the House Main Door*

Nelson and Dodder remained near the House Main Door for at least 10 minutes.  *See* Nelson SOO ¶ 24; Dodder SOO ¶ 19.  At approximately 2:45 p.m., police deployed tear gas in efforts to regain control of the area around the door—rather than leave, both Nelson and Dodder donned their respirators and goggles. *See* Image 17; Sentencing Exhibit 4.



*Image 17: Dodder (circled orange) and Nelson (circled yellow) wore goggles and respirators in the hallway outside the main entrance to the House Chamber (Sentencing Exhibit 4)*

Nelson and Dodder split up for several minutes near the House Chamber, before meeting up again the Rotunda at approximately 2:52 p.m.  *See* Nelson SOO ¶ 25; Dodder SOO ¶ 20.  Nelson took photos while in the Rotunda.  Nelson SOO ¶ 25.  At 2:58 p.m., the pair headed towards the East Rotunda Doors, where Dodder lent his lighter to another rioter having a smoke.  Nelson SOO ¶ 26; Dodder SOO ¶ 20; *see* Image 18.



*Image 18: Dodder (circled orange) lent his lighter to another rioter as Nelson looked on*

Rather than leave, however, the pair turned around and headed back into the Rotunda for several more minutes.  Nelson SOO ¶ 26; Dodder SOO ¶ 20.  Finally, at 3:04 p.m., Dodder and Nelson left the Rotunda and exited the Capitol through the East Rotunda Doors. *See* Nelson SOO at ¶ 27; Dodder SOO ¶ 21.  In total, they spent about 48 minutes inside the U.S. Capitol Building. *Id.*

### The Arrest

On October 4, 2023, Nelson self-surrendered on an arrest warrant at the FBI Resident Agency in Champaign, Illinois.  The same day, Dodder turned himself in to the FBI in Las Vegas, Nevada.  Dodder was asked to bring with him multiple items, including the GoPro he had at the U.S. Capitol on January 6, 2021 and the copy of any files or pictures he took using that GoPro.  Dodder provided a GoPro on his arrest, but after executing a search warrant, investigators found that it had no memory card.

*The Charges and Plea Agreement*

On February 8, 2024, the United States charged Nelson and Dodder by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On March 5, 2024, pursuant to a plea agreement, Nelson pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). On April 4, 2024, pursuant to a plea agreement, Dodder pleaded guilty to Counts Three and Four of the Information, charging him with violations of 40 U.S.C. § 5104(e)(2)(D) and (G). By plea agreement, both defendants agreed to pay $500 in restitution to the Architect of the Capitol.

*Nelson's Post-Plea Interviews*

Pursuant to the plea agreement, the Government twice sought to interview Nelson in the presence of counsel. The first interview, held on April 17, 2024, was ultimately unsuccessful and terminated before its completion. While Nelson admitted to the conduct literally described in the statement of facts, many of his explanations for that conduct were either internally inconsistent or did not stand up to serious scrutiny. Some examples follow:

- Nelson gave numerous "justifications" for his conduct that were flatly inconsistent with the evidence or his own admissions in his Statement of Offense.

  o When asked about why he brought a gas mask and goggles with him to Washington, D.C., Nelson said he brought them to protect himself from an attack from BLM or Antifa or the resulting police response. Nelson said he did not remember how Dodder got a gas mask.[3] Yet the evidence shows that Nelson wore his gas mask and goggles whenever police deployed chemical agents to dispel *him* and other rioters.

  o Nelson intimated that police at the scaffolding were to blame for the breach, highlighting their use of pepper spray and rubber bullets. Nelson also claimed that he had no option but to move forward with the mob through the scaffolding in order to get away from the crowd. But the evidence shows that Nelson donned his gas mask and goggles moments before the breach,

---

[3] As noted below, Dodder said they bought the gas masks together. Nelson would later clarify this particular statement in his second interview, but stood on this explanation for why they brought them to DC.

and was a willing participant in the mob's sweep through the scaffolding—even trying to body-check an officer in his way.

- o Nelson also claimed that he made the decision to enter the Capitol building itself because he had no other option to get away from the crowd. Again, this claim is flatly contradicted by the video evidence, as well as by Nelson's own stated motivations.

- Nelson selectively and inconsistently downplayed his intent to obstruct Congress' certification of the election. For example:

- o Nelson admitted he knew that at the time that Congress was meeting to hold a vote to decide whether to look into inaccuracies in the voting process, and hoped his attendance at the January 6 rally would result in a different electoral outcome.

- o When asked about his January 4 post with hashtag "#revolutiondinner," Nelson explained that he meant "rally," as he intended to convey his support for President Trump at the upcoming rally against supposed inaccuracies in the voting process.

- o But Nelson avoided the "revolution" topic altogether when asked about his decision wear colonial attire. Nelson claimed he wore that outfit because he liked that period of U.S. history and the rally was held in Washington, D.C., saying vaguely that it was an unprecedented moment in time that tied the two periods of history together.

- o And Nelson was asked about why, moments prior to the breach, he yelled at police at the scaffolding. Nelson claimed his and the mob's anger was not really about votes stolen in the election—rather, Nelson claimed that their anger was about job losses and government-imposed COVID lockdowns. As noted below, Nelson would later back off this explanation.

Following discussions with defense counsel, the Government again interviewed Nelson on June 17, 2024. Nelson revised or clarified several statements from his first interview. Nelson explained he wore his revolutionary war garb as a "fitting symbol for the occasion." Nelson described his goals and emotions on January 6 as multifaceted—that he was motivated by a recent job loss, COVID-lockdowns, and—for Nelson, the straw that broke the camel's back—his belief that there was fraud in the election. Nelson explained that when he shouted, "To protect the constitution of the United States against enemies, foreign and domestic" at the scaffolding, he was in fact referring to members of Congress as the "enemies." When the rioters breached the police line, this time Nelson explained that he got swept up in a mob mentality; his initial intent—to rally

at the Capitol—devolved into chaos.  Nelson said that the reason he went into the Capitol building with the mob was that it was his best option not to get arrested.  Nelson knew he shouldn't have been there—according to Nelson, he and Dodder were "elated" in the Rotunda because they had made it where they knew they weren't supposed to be.  Still, some of Nelson's explanations were self-serving or minimized his own conduct.  Nelson said that he had been pepper-sprayed, and so when he grabbed the officer's shield on the Northwest Stairs, it was in order to push past police and get to water at the top of the stairs.  This is both implausible and does not align with the video evidence of his push.  Nelson also claimed to not know where the House Main Door was until he was already there, despite his enthusiastic participation in the mob's sweep through the heart of the Capitol building.  Nelson said he spoke for several minutes with an officer to one side of the door.[4]  And Nelson said that when police began deploying chemical agents to regain control of that area, he began to look for a way out.  Yet, he donned his respirator and goggles and remained in that area for several more minutes.  Nelson explained that he was looking for an exit without getting arrested, but Nelson would not leave the Capitol until 3:04 p.m.—after taking photos in the Rotunda—spending almost an hour inside.

*Dodder's Post-Plea Interview*

Pursuant to the plea agreement, the Government interviewed Dodder on May 15, 2024 in the presence of counsel.  Dodder said that he initially learned about the "Stop the Steal" rally from Nelson.  As they planned their trip, Dodder and Nelson discussed what items to bring, where they wanted to stay, and where the nearest hospital was.

---

[4] Dodder said this during his interview as well, as noted below, but the Government has not found CCV footage substantiating this claim.

Dodder claimed dual motivations for attending the rally.  Dodder wanted to attend the rally to support President Trump, as he was angry because he felt that anyone who supported Trump was under attack in the media and otherwise.  Dodder said he also wanted to attend to film the event and produce a documentary to show conservatives in a positive light and how peaceful they were, which he contrasted with BLM.  Dodder expected the possibility of clashes at the rally, as he knew that BLM and Proud Boys were going to be present.  Dodder contrasted his own motives with Nelson's, who Dodder claimed wore a Revolutionary War costume to be a "rabble rouser."

According to Dodder, Nelson purchased Dodder's plane ticket from Nevada to Illinois.  Dodder flew to Illinois and they stayed the night of January 4, 2021 at Nelson's house.  On January 5, 2021, Dodder and Nelson drove down from Illinois to Washington, D.C.  According to Dodder, they purchased goggles and gas masks on their way down—Dodder said that he believed there was a possibility they would encounter OC spray or tear gas.   Dodder chose to wear camouflage because it was theatrical, but he also thought it would also cover his body better if he fell or got into a confrontation.

Dodder and Nelson knew that Congress was meeting inside the U.S. Capitol Building and why.  Dodder said that they did not hear the speeches at the "Stop the Steal" rally because they were too far back, but as they walked towards the Capitol, Dodder heard on a portable radio about the election certification events that were happening inside the Capitol.

Dodder admitted to yelling at officers at the scaffolding, saying that he was angry because he wanted to protest and did not understand why the police were shooting pepper spray, tear gas, and rubber bullets.  Dodder admitted that these emotions led to him pushing against the line of officers.

When they made it inside the Building, Dodder told Nelson that they needed to stay on the edge of the crowd as it was less likely that they would be arrested.  Dodder said he saw Nelson speak to a police officer at some point.  When the pair reached the window in the Statuary Hall Connector overlooking the officers, Dodder said he realized the severity of what had transpired and talked to Nelson about leaving the Building.[5]  When the pair reached the House Main Door, Dodder knew that House Chamber was on the other side, and he admitted that the pair donned gas masks so the tear gas police were deploying would not affect them.  Dodder said they nonetheless continued to wander as Dodder claimed they did not know how to get out.  Dodder admitted that he had filmed blood on the ground.

After they left the Capitol, Dodder and Nelson returned to their hotel for a short time then immediately left D.C., driving through the night back to Illinois.  When they got back to Illinois, Dodder, Nelson and one other person watched Dodder's GoPro footage.

Dodder was scared that he was in deep trouble, and it also bothered him how the media was labeling participants in the January 6 attack.  Dodder's significant other broke up with him for a time as a result of the events of January 6.  He did not want to be associated with the events of January 6, so he destroyed the GoPro footage upon his return to Las Vegas.

## III.   Statutory Penalties

Nelson now faces sentencing for violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 1 year of imprisonment and a fine of up to $100,000.

---

[5] Dodder's recounted timeline is off, as he seemed to indicate he saw this 'red flag' *after* the mob rushed Statuary Hall and police deployed tear gas to disperse them.  In fact, the window incident occurred beforehand at around 2:35 p.m., and the pair would not leave the building for another half hour.

Dodder now faces sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and (G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Both defendants must also pay restitution under the terms of their plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.     The Sentencing Guidelines and Guidelines Analysis (Nelson Only)

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in Nelson's PSR, with one exception. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Nelson's plea agreement reserved the parties' right to argue over the applicability of Section 4C1.1. Section 4C1.1 does not apply in this case, because Nelson used "violence or credible threats of violence" against the USCP officer on the Northwest scaffolding. U.S.S.G. § 4C1.1(a)(3). Other judges in this district have defined "violence" in this context as "[t]he use of physical force," typically

"accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (also citing definition of violence as "exertion of any physical force so as to injure or abuse."); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting the definition of violence from *Bauer*). Similarly, a "credible threat of violence" is a "a believable expression of an intention to use physical force to inflict harm." *Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6.[6] In this case, Nelson used violence, or, in the alternative, a credible threat of violence. Nelson used violence because he used physical force—he grabbed an officer's shield and then attempted to body-check it. If the "fury, vehemence, or outrage" of Nelson's attempted push does not speak for itself, it is clear when viewed in its proper context—as the mob was rushing at a retreating police line, Nelson admitted he had given in to mob mentality. There is no plausible reading of Nelson's attempt to forcibly body-check the shield other than the intent to harm the holder. But even if the Court disagreed that this conduct constituted direct violence, it is at the very least a credible threat of the same – a believable expression of Nelson's intent to use physical force to inflict harm. *See, e.g., United States v. Heather Kepley*, 23-cr-162 (BAH) (declining to apply § 4C1.1 on § 1752(a)(1) conviction because defendant's presence in the Tunnel during the mob's heave-ho constituted a credible threat of violence under § 4C1.1); *see also United States v. Giberson*, 23-cr-115 (CJN) (participation in heave-ho in the Tunnel on § 231 conviction).

      Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and

---

[6] Judge Howell has also explained that "evaluating whether credible threats of violence were posed by the defendant's offense conduct. . . requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[7]

Accordingly, the Government's calculation of Nelson's Guidelines is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

The U.S. Probation Office applied the same calculation, but also applied the two-point reduction in U.S.S.G. § 4C1.1, resulting in a total adjusted offense level, after acceptance, of 2. Nelson PSR ¶ 58. The U.S. Probation Office calculated Nelson's criminal history as a Category I. Nelson PSR ¶ 61. Accordingly, the U.S. Probation Office calculated Nelson's corresponding Guidelines imprisonment range at 0 to 6 months. Nelson PSR ¶ 112. Nelson's Guidelines imprisonment range is the same even if the Court agrees with the Government that the correct total offense level as 4.

---

[7] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence for Nelson of 6 months of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.  And for Dodder, they weigh in favor of a sentence of 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Nelson's and Dodder's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Starting with Nelson, one of the most important factors is his role as part of the vanguard of the breach of the Northwest Scaffolding.  Choosing to draw attention to his cause with his Revolutionary War garb, Nelson came prepared for violence with a respirator and goggles, joined the mob's surge as it overran officers, and rode its destructive path through the scaffolding.  *See* Sentencing Exhibit 1.  But most significantly—and the fact that by itself merits a 6 month sentence in this case—Nelson used force against an officer in his path.  Although it was clear that the officer was surrounded and trying to retreat, Nelson grabbed the officer's shield—meant to protect law enforcement from rioters—and attempted to body check it.  As a result, the officer dropped the shield—a tool meant to protect police—which Nelson helped turn over to the mob by assisting another rioter in picking up.  This is unquestionably serious conduct meriting significant incarceration in this case.

Dodder also was prepared for violence—he wore military-style camouflage, was wearing protective goggles, and had brought a gas mask.  He also joined the surge of officers overrunning the police line at the Northwest Scaffolding, a critical breach that would clear the mob's path to the Capitol Building.

Another important factor for both defendants, one that colors the 48 minutes that both Dodder and Nelson spent inside, is that they knew that Congress was meeting to certify the election before they ever entered the building.  Dodder admitted that he heard on a portable radio about the election certification events that were happening inside the Capitol—which Nelson generally echoed.  When Dodder reached the House Main Door, he admitted that he knew what lay beyond.  Dodder and Nelson stood feet away as the mob attempted to break down the door.  Yet, when police deployed tear gas, Dodder and Nelson did not leave—they donned their protective respirators so that the gas wouldn't affect them.  Nelson and Dodder's presence at the House Main

Door bolstered the strength and confidence of the mob and detracted from officers' ability to secure the building and protect the House.  The indelible image of the respirator-clad pair shrouded in gas—willing foot soldiers of chaos—crystallizes the harm of their actions to the perceived stability of our republic.  *See* Image 17.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  History and Characteristics

Neither Nelson nor Dodder have criminal convictions.  Nelson PSR ¶¶ 59–61; Dodder PSR ¶¶ 37–40.

Nelson's lack of convictions, however, does not tell the full story.  Nelson's military service record includes a history of misconduct suggesting anger issues and the need for mental health counseling.  PSR ¶¶ 80, 93–94.  Most notably, his criminal history score of zero, while accurately calculated, does not reflect the serious 2015 offense described in the PSR that led to his "other than honorable" separation.  PSR ¶ 63.

While both Nelson and Dodder's military service is commendable, it also makes their conduct on January 6—overrunning officers defending the Capitol while wearing protective gear—all the more concerning, and demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While Nelson has now accepted responsibility for his actions through his plea, his post-plea interviews suggest a clear need for specific deterrence. Nelson made statements during his first interview that were inconsistent with the offense conduct to which he admitted—such as having no choice but to surge forward up the scaffolding or to enter the Capitol Building in order

28

to get away from the mob.[8]  In the second interview, Nelson gave a more believable accounting of his motivations, but still minimized his actions or painted a self-serving picture.  For example, Nelson's stated "multifaceted" motivations that day overcomplicate the clear direction to which all of his statements on Capitol grounds, his colonial outfit, and path to the House Door lead— obstructing Congress.  And Nelson's explanation that he and Dodder struggled to find a way to leave when they got to the House Door is hard to square with their lethargic path out of the building almost twenty minutes later.

Nelson credibly acknowledged that he got swept along with mob mentality in the scaffolding, and that he then stuck with the mob through the building because he thought he would be less likely to be arrested.  The fact that Nelson wasn't deterred by the violence against police and sought to evade responsibility indicates that, in the right circumstances, he could get swept up in similar conduct again.

In short, while Nelson has accepted responsibility and begun to grapple with the severity of his actions, this eleventh-hour development is still incomplete and suggests a likelihood of recidivism under the right combination of circumstances.  The Court should critically assess Nelson's stated remorse and impose a sentence that specifically deters him from joining a violent mob like he did on January 6.

There also is a clear need to specifically deter Dodder.  Dodder's post-January 6 conduct and his statements show someone who regrets the legal and societal consequences from his participation in the January 6 attack, but does not truly appreciate the wrongfulness of his conduct. During his post-plea interview with the FBI, Dodder portrayed many of his actions passively as if

---

[8] In light of the clarifications Nelson made during the second debrief, the Government is not seeking denial of a downward adjustment for acceptance of responsibility.

he were a citizen-journalist who got carried away—especially relative to Nelson.  But whatever his initial goals for the day, his description is hard to square with the objective evidence of his conduct:  that he (a former Marine) joined the mob overrunning the many lines of police up to and inside the Building; that he knew Congress was meeting to certify the election and proceeded with Nelson all the way to the House Door; that he joined chants and stuck with "our guys" to avoid arrest; and that he remained by the House Door even in the face of tear gas.  Dodder still appears to cast blame elsewhere, indicating that he joined the push at the scaffolding because he was angry at *police* for shooting pepper spray and tear gassing rioters.

Dodder was affected by the social consequences of his actions—*others'* reactions to what he did—like the media fallout to the January 6 attack and its effect on his personal life.  But fearing the legal consequences to himself, he nonetheless destroyed valuable evidence (his GoPro Footage) on his return to Nevada.  It is still not clear that Dodder has embraced the wrongfulness of what he did, its effect on the people inside and defending the Capitol, or its stain on our democracy.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).  Only incarceration will be sufficient to deter Dodder specifically from ever participating in conduct like he did on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Nelson and Dodder based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.  For both the Class A misdemeanor to which Nelson pled guilty and the Class B misdemeanors to which Dodder pled guilty, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations for Nelson and Dodder, respectively.

<u>Nelson</u>

Samuel Fisher traveled Washington, D.C. with the intent of impeding the certification of the Electoral College.  *United States v. Samuel Fisher*, 21-cr-142 (CJN).  Fisher overtly glorified and promoted political violence online in the days leading up to January 6 and after.  Like Nelson, Fischer had reason to believe that events would turn violent—but unlike Nelson, Fisher brought

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

weapons to his Airbnb outside of DC, though he did not bring them to the Capitol.[10]   Fisher entered the Capitol building through the Memorial Door and spent 15 minutes inside the Rotunda. For his conviction of Section 1752(a)(1), this Court sentenced Fisher to 120 days incarceration, 12 months supervised release, 60 hours community service, and $500 restitution.  However, Fisher's conduct on January 6 itself pales in comparison to Nelson's.  Unlike Fisher, Nelson (i) wore a gas mask and goggles, (ii) participated in multiple breaches up of police lines in the scaffolding, (iii) put hands on an officer's shield and attempted to body check that officer, (iv) traveled in multiple areas of the Capitol for over 48 minutes, including the Senate Wing Door, Crypt, and Rotunda, and (v) went all the way to the House Main Door, where rioters were attempting to break through. Although mitigated by his lesser level of planning or overtly violent rhetoric, Nelson's conduct on the day itself—including his use of force against an officer—merits a commensurately greater incarceratory sentence.

Blake Reed made posts calling for the 2020 Presidential Election to be overturned and explored joining the Proud Boys.  *United States v. Blake Reed*, 21-cr-204 (BAH) (D.D.C).  Like Nelson, he brought a respirator and ski goggles to Washington DC and donned them when seeing police deploy tear gas.  On Capitol grounds, Reed took videos of other rioters, cheered attacks on officers, then used repurposed bike racks to climb the walls on the West Side.  Like Nelson, Reed entered the Capitol through the Senate Wing, and went through the Crypt and the Rotunda to the area outside the House Chamber and Speaker's Suite.  Reed posted photos of the riot to social media but subsequently destroyed evidence by deleting information from his mobile telephone and social media accounts and encouraged a codefendant to follow suit.  On his conviction of Section 1752(a)(1), Judge Howell sentenced Reed to 42 days incarceration (served in 14-day increments),

---

[10] Fisher also had a recent state conviction on weapons charges.

3 months home detention as a condition of 36 months' probation, a $2,500 fine, and $500 restitution.  Nelson's conduct is similar to Reed's in many ways but with one notable difference— Nelson put hands on an officer's shield and attempted to body check that officer.  This fact alone merits substantially more incarceration.

Ryan Kelley, a former political candidate, was also part of the group of rioters who breached the Northwest scaffolding.  *United States v. Ryan Kelley*, 22-CR-222 (CRC) (D.D.C.). Kelley ignored warning signs to leave the restricted Capitol grounds (including flash bang grenades, chemical irritants, and human blood on the Northwest stairs), encouraged and assisted other rioters, including by supporting another rioter who was passing forward a metal bike rack to rioters closer to police, and ripped a protective tarp covering the scaffolding adjacent to the Northwest stairs.  Kelley climbed through scaffolding and ran up the railing next to the Northwest stairs, took photos and video of the scenes of chaos and rioters rushing and attacking officers, spent almost two hours on restricted Capitol grounds, and failed to express sincere remorse.  On his Section 1752(a)(1) conviction, Judge Cooper sentenced Kelley to 60 days' incarceration, 12 months' supervised release, a $5,000 fine, $500 restitution, and a $25 mandatory special assessment fee.  Like Kelley, Nelson was a key component of the breach of the Northwest scaffolding and ignored warning signs.  Nelson's assistance was more direct—he grabbed a shield from an officer and tried to body-check that officer's shield.  And significantly, after all that conduct, Nelson also spent 48 minutes inside the Capitol Building, going to the House Main Door itself.  Nelson's conduct merits a sentence at the top of the Guidelines Range.

Lastly, Eric Cramer made direct physical contact with police by grabbing and holding onto one officer's baton and grasping another officer's arm on the Lower West Terrace.  *United States v. Eric Cramer*, 22-CR-339 (RDM) (D.D.C.).  Cramer pled guilty to 18 U.S.C. § 1752(a)(2).  Like

Nelson, Cramer came prepared for violence, in his case by bringing a face mask with respirator and a baseball bat to the Capitol. Cramer joined the mob's forcible breach of the Senate Wing Door—about a half hour after Nelson entered, in parallel to Nelson's own actions at the scaffolding—and remained inside the Building for about five minutes (versus 48 minutes for Nelson). Cramer posted a picture of a baton that he took home with him, lied to FBI agents about his conduct, and expressed no remorse. Judge Moss sentenced Cramer to 8 months incarceration, 12 months supervised release, and restitution. Although a higher Guidelines Range applied, Cramer's physical contact with two different officers is a significant aggravator shared by Nelson's own shield grab and attempted body-check of the retreating officer on the Northwest Steps. A slightly less, but comparable, sentence is appropriate.

Dodder

Clifford Meteer breached and remained in the Capitol building for approximately 31 minutes, including in the Crypt, Statuary Hall, and just outside the House Chamber, and only left after law enforcement forced him out. *United States v. Clifford Meteer*, 21-CR-630 (CJN) (D.D.C.). Meteer made numerous statements on Facebook and in interviews after January 6 reflecting a lack of remorse, declined to admit to the FBI he went inside, and falsely downplayed the violence on January 6. Unlike Dodder, Meteer had a criminal history—convictions for tampering with evidence and criminal possession of a weapon—and possessed 10 firearms and several rounds of ammunition in his home. This Court sentenced Meteer on his conviction of 40 U.S.C. § 5104(e)(2)(G) to 2 months' incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Dodder has no criminal history and did not make the same kind of public statements, but was part of a crowd that overran the police line at the scaffolding, spent

longer inside the Capitol, was aware of the certification, and destroyed evidence—all meriting a sentence of imprisonment of similar length.

Jeffery William Hubbard, a veteran, also entered the Capitol building through the shattered window next to the Senate Wing door at approximately 2:22 p.m., a few minutes after Dodder. *United States v. Jeffrey Hubbard*, 21-cr-737 (CJN) (D.D.C). Like Dodder, Hubbard entered the Statuary Hall Connector, joined the mob that pushed through to the House Main Door, and witnessed rioters attempt to violently break through the House Chamber doors as they chanted, "Stop the Steal." Unlike Dodder, Hubbard threatened to fight officers, maneuvered to the front of the melee with police in the Rotunda, and was pepper sprayed in the face before being escorted out. Hubbard spent a total of 54 minutes inside the Capitol building, similar to Dodder. This Court sentenced Hubbard on his parading conviction to 45 days' incarceration, 36 months of probation, a $500 fine, and $500 in restitution. Dodder's conduct is more egregious in some ways (he destroyed evidence) and less in others (he did not threaten police)—so a similar sentence is appropriate.

Finally, Landon Manwaring entered the Capitol through the Senate Wing Door, went to the Crypt during the breach of the police line there, and went near Speaker's Pelosi's suite. *United States v. Landon Manwaring*, 22-cr-270 (CJN) (D.D.C). Manwaring remained inside the Capitol for approximately half an hour and minimized his conduct during a second interview with the FBI, falsely claiming that police had "welcomed" him into the Capitol building and that he saw no property destruction when he entered. Unlike Dodder, Manwaring committed another serious crime after January 6. This Court sentenced Manwaring to 30 days' incarceration, 35 months of probation, and $500 in restitution. Dodder also directly participated in a breach of a police line at the scaffolding and destroyed evidence, and so a slightly more severe sentence is appropriate here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Nelson and Dodder each must pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[12] Nelson Plea Agreement at ¶ 12; Dodder Plea Agreement at ¶ 11.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Nelson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 134.

## VII. Fine

Nelson's conviction for violation of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000, and Dodder's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and (G) subject him to a statutory maximum fine of $5,000 on each count.  *See* 18 U.S.C. § 3571(b), (c). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  As applied to Nelson, the sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

U.S.S.G. § 5E1.2(a) (2023).  Here, each defendant's financial assets set forth in the PSR suggest that they are unable, and unlikely to become able, to pay a fine.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Derek Nelson to 6 months of incarceration, 12 months of supervised release, 60 hours in community service, and $500 in restitution.  The government recommends that this Court sentence Defendant Derek Dodder to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.  These sentences protect the community, promote respect for the law, and deter future crime by imposing restrictions on each defendant's liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Michael L. Barclay*
Assistant United States Attorney
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov